**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION**

**BRENDA L. TALLEY**                                                                                   **PLAINTIFF**

**V.                           CASE NO.: 4:11CV00247 BD**

**MICHAEL J. ASTRUE, Commissioner,
Social Security Administration                                                                    DEFENDANT**

**MEMORANDUM OPINION AND ORDER**

Plaintiff Brenda L. Talley appeals the final decision of the Commissioner of the Social Security Administration (the "Commissioner") denying her claim for Disability Insurance benefits ("DIB") under Title II of the Social Security Act (the "Act") and Supplemental Security Income ("SSI") under Title XVI of the Act. For the following reasons, the decision of the Commissioner must be REVERSED and REMANDED.

**I.    Background:**

Ms. Talley filed for DIB and SSI on May 15, 2008, claiming disability since June 23, 2007.[1] Ms. Talley alleged that she was disabled as a result of diabetes, arthritis, anxiety, morbid obesity, malabsorption syndrome, agoraphobia, hypertension, supraventricular tachycardia, obsessive compulsive disorder, neuropathy, retinopathy, endometriosis, degenerative joint disease, chronic insomnia, and deep vein thrombosis. (Tr. 65-71, 80)  After denials initially and upon reconsideration, Ms. Talley requested a

---

[1] At the hearing, the ALJ established that Ms. Talley drew unemployment benefits through February of 2008, but he did not modify her onset date. (Tr. 39, 125)

hearing before an Administrative Law Judge ("ALJ"). (Tr. 84-85) The ALJ held a hearing on July 6, 2009, at which Ms. Talley appeared with her attorney and testified. (Tr. 16-42) The ALJ also heard testimony from a vocational expert. (Tr. 41-42)

The ALJ issued a decision on November 4, 2009, finding that Ms. Talley was not disabled for purposes of the Act. (Tr. 50-60) On January 20, 2011, the Appeals Council denied her request for review, making the ALJ's decision the Commissioner's final decision. (Tr. 1-4)

At the time of the hearing before the ALJ, Ms. Talley was 47 years old and was living alone in a house next door to her mother and brother. (Tr. 19, 40-41) She had previous work as a registered nurse. (Tr. 138)

## II.     Decision of the Administrative Law Judge:

The ALJ followed the required five-step sequence to determine: (1) whether the claimant was engaged in substantial gainful activity; (2) if not, whether the claimant had a severe impairment; (3) if so, whether the impairment (or combination of impairments) met or equaled a listed impairment; (4) if not, whether the impairment (or combination of impairments) prevented the claimant from performing past relevant work[2]; and (5) if so, whether the impairment (or combination of impairments) prevented the claimant from

---

[2] If the claimant has sufficient residual functional capacity to perform past relevant work, the inquiry ends and benefits are denied. 20 C.F.R. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv).

performing any other jobs available in significant numbers in the national economy. 20 C.F.R. §§ 404.1520(a)-(g); 416.920(a)-(g).

The ALJ found that Ms. Talley had not engaged in substantial gainful activity since her alleged disability onset date but noted that she had received unemployment benefits into the first quarter of 2008, indicating she was available and willing to return to work during that period. (Tr. 52) The ALJ also found that Ms. Talley had the following severe impairments: diabetes mellitus, back disorder (degenerative arthritis), obesity, and mood disorder. (Tr. 52) According to the ALJ, Ms. Talley did not have an impairment or combination of impairments, however, that met or equaled an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1526, 416.926). (Tr. 53)

The ALJ determined that Ms. Talley retained the residual functional capacity ("RFC") to perform sedentary work except as follows: she could occasionally lift/carry ten pounds and frequently lift/carry less, stand/walk for two hours; occasionally climb, balance, crawl, kneel, stoop, and crouch. She had moderate restriction in her ability to maintain the activities of daily living, social functioning, and concentration, persistence, and pace. She was moderately limited in her ability to understand, remember, and carry out detailed instructions; make judgments on simple work related decisions; interact appropriately with the public; and respond appropriately to usual work situation and routine work changes. She could perform work where interpersonal contact was incidental to the work performed, complexity of tasks is learned and performed by rote,

with few variables, little judgment was required, and supervision was simple, direct, and concrete. (Tr. 55)

The ALJ concluded that Ms. Talley could not perform her past relevant work as a registered nurse. (Tr. 58) Relying on the vocational expert's responses to interrogatories, the ALJ concluded Ms. Talley could perform work as a production worker, credit authorizer, or interviewer and that she was not disabled within the meaning of the Act. (Tr. 59)

### III. Analysis:

A.  *Standard of Review*

In reviewing the Commissioner's decision, this Court must determine whether there is substantial evidence in the record as a whole to support the decision. *Boettcher v. Astrue*, 652 F.3d 860, 863 (8th Cir. 2011); 42 U.S.C. § 405(g). Substantial evidence is something less than a preponderance, but it must be, "sufficient for reasonable minds to find it adequate to support the decision." *Boettcher*, 652 F.3d at 863 (citing *Guilliams v. Barnhart*, 393 F.3d 798, 801 (8th Cir. 2005)).

In reviewing the record as a whole, the Court must consider both evidence that detracts from the Commissioner's decision and evidence that supports the decision; but, the decision cannot be reversed, "simply because some evidence may support the opposite conclusion." *Id*. (citing *Pelkey v. Barnhart*, 433 F.3d 575, 578 (8th Cir. 2006)).

B.   *Severe Impairments and Residual Functional Capacity*

Ms. Talley complains that the ALJ erred by failing to find that her diabetic retinopathy, supraventricular tachycardia (SVT), peripheral neuropathy, and hip pain were severe impairments. (#9 at p. 14) She also complains that the ALJ's residual functional capacity assessment is not supported by substantial evidence in the record.

Ms. Talley had the burden of showing that her impairments were severe; however, this burden is not a great one. *Caviness v. Massanari*, 250 F.3d 603, 605 (8th Cir. 2001). Rather, step two of the sequential evaluation process provides a de minimus screening device to dispose of groundless claims. *Bowen v. Yuckert*, 482 U.S. 137, 153-54, 107 S.Ct. 2287 (1986).

An impairment is severe if the effect of the impairment on the claimant's ability to perform basic work is more than slight or minimal. *Warren v. Shalala*, 29 F.3d 1287, 1291 (8th Cir. 1994) (quoting *Cook v. Bowen*, 797 F.2d 687, 690 (8th Cir. 1986)). Basic work activities are the abilities and aptitudes necessary to do most jobs, such as hearing, standing, walking, sitting, lifting, handling, remembering simple instructions, using judgment, and dealing with changes in a routine work setting. 20 C.F.R. §404.1521. The Commissioner must resolve any doubt as to whether the required showing of severity has been made in favor of the claimant. SSR 85-28 at *4 (1985).

Once it is determined that an individual has a severe impairment for purposes of step two, the combined effect of all impairments are considered in determining an

individual's residual functional capacity, regardless of whether the impairments are labeled severe or non-severe. 20 C.F.R. §§ 404.1545(e) and 416.945(e).

In assessing residual functional capacity, the ALJ must give appropriate consideration to all of the claimant's impairments, and base the assessment on competent medical evidence. *Partee v. Astrue*, 638 F.3d 860, 865 (8th Cir. 2011) (citations omitted). An ALJ should consider the quality of the claimant's daily activities and the ability to sustain activities, interests, and relate to others over a period of time. The frequency, appropriateness, and independence of the activities must also be considered. *Boettcher*, 652 F.3d at 866 (internal quotation marks and citation omitted).

      1.      Diabetic Retinopathy

Ms. Talley claims that the ALJ erred by failing to find that her diabetic retinopathy was a severe impairment. The ALJ noted that Ms. Talley had been referred for an evaluation of diabetic retinopathy and stated that her diabetes could be expected to cause vision changes. (Tr. 53) But he did not find her diabetic retinopathy to be a severe impairment; nor did he discuss Ms. Talley's vision when assessing her residual functional capacity.

The Commissioner does not dispute that Ms. Talley was diagnosed with diabetic retinopathy, but argues that the diagnosis, by itself, does not indicate a severe impairment. This statement of the law is true, as far as it goes. However, the ALJ still had a duty to

consider Ms. Talley's diabetic retinopathy when considering her residual functional capacity, and it appears that he failed to do so.

In November, 2009, Ms. Talley was referred for an eye examination after complaints that her eyes were hurting. (Tr. 208) The records from Ms. Talley's visit to an opthamologist in November, 2008, indicate that she had a history of retinal bleeding and glaucoma. (Tr. 482) In a narrative report dated November 13, 2009, Gary Russell, M.D., a physician at River Valley Medical Center, wrote that, according to her ophthalmologist, Ms. Talley had diabetic retinopathy with marked decrease in her vision and at least one retinal hemorrhage that was treated with laser therapy.[3] (Tr. 535) On November 19, 2009, Ms. Talley was seen at River Valley Christian Clinic ("River Valley") complaining of vision problems. She was referred to an eye doctor. (Tr. 543)

At the hearing, Ms. Talley testified that she had glasses, but that they were for distance vision and not for reading. (Tr. 34-35) She stated that she was no longer able to read the newspaper because her vision was impaired. (Tr. 28-29) However, she was able to read a large-print Bible. (Tr. 29) She also testified that one reason she used a cane was

---

[3] Dr. Russell's letter was submitted to the Appeals Council after the ALJ hd rendered his decision. (Tr. 1-4) The Appeals Council considered the letter when it declined to review the ALJ's decision. (Tr. 2, 4) Consequently, it may be considered by this Court. See *United States v. Bergmann*, 207 F.3d 1065, 1068 (8th Cir. 2000) (citing *Riley v. Shalala*, 18 F.3d 619, 622 (8th Cir. 1994)) (court's role is to determine whether ALJ's decision is supported by substantial evidence, including evidence submitted after the determination was made).

to help her deal with her visual impairment because she had difficulty detecting depth and color change.

In spite of considerable evidence in the record indicating that Ms. Talley's diabetic retinopathy has more than a minimal effect on her ability to work, it does not appear that the ALJ considered it when assessing her residual functional capacity.  The ALJ found that Ms. Talley was capable of working as a production worker which, according to the *Dictionary of Occupational Titles,* would require her to frequently use near acuity and depth perception, and to occasionally use color vision.  Employment and Training Admin., U.S. Dep't of Labor, *Dictionary of Occupational Titles* (4th ed.  rev. 1991).

Further, it does not appear that any consulting or examining source offered an opinion about the extent of visual limitation caused by Ms. Talley's retinopathy.  Remand is necessary for the ALJ to more fully and fairly develop the record regarding the extent of Ms. Talley's visual impairment, if any.

      2.      Peripheral Neuropathy

On November 7, 2007, Kenneth Turner, M.D., diagnosed Ms. Talley with diabetic peripheral neuropathy.  On September 18, 2008, Ms. Talley complained of numbness and tingling during her visit to River Valley.

At the hearing, Ms. Talley testified that her feet and legs were cold and numb bilaterally.  (Tr. 146)  She stated that she had problems with strength and grip, could not open jars, and dropped things.  (Tr. 25, 27-28)  She had difficulty holding a glass of milk

because of problems with her grip. (Tr. 29) She also stated that her peripheral neuropathy caused her knees to buckle, leading her to use a cane. (Tr. 30) She had difficulty getting up and down the three steps leading to her house. (Tr. 30)

In his opinion, the ALJ acknowledged Ms. Talley's diabetic neuropathy and considered whether there was documentation of neuropathy in two extremities significant enough to meet a Listing. (Tr. 53) He also noted that her diabetes could cause "tingling and numbness" in the hands or feet. (Tr. 53)

When assessing Ms. Talley's residual functional capacity, however, the ALJ focused his assessment only on the neuropathy in her feet. He noted that she had reported numbness, tingling, and pain in her feet. (Tr. 56) The ALJ stressed, however, that the orthopedic specialist had found that she had normal gait, that her neurovascular status was intact, and that she had positive straight leg tests. (Tr. 56) The ALJ concluded that Ms. Talley could sit for six hours; stand/walk for two hours; and could occasionally climb, balance, crawl, kneel, stoop, or crouch. (Tr. 57)

The ALJ did not address the evidence in the record indicating that Ms. Talley's peripheral neuropathy also affected her hands. He did not limit her residual functional capacity in any way related to her hands and concluded she could perform work as a credit authorizer and interviewer – jobs that require frequent handling.

The ALJ's failure to fully account for Ms. Talley's peripheral neuropathy in assessing residual functional capacity is error. Again, it does not appear that

9

any examining medical professional had ordered a nerve conduction study of Ms. Talley or had offered an opinion as to the extent of the limitation caused by her peripheral neuropathy.[4] On remand, the Commissioner should consider the effect, if any, that Ms. Talley's peripheral neuropathy in her legs, hands, and feet has on her residual functional capacity.

        3.      Hip Pain

Ms. Talley alleges that it was error for the ALJ not to conclude that her hip pain was a severe impairment. The ALJ acknowledged Ms. Talley's complaints of hip pain at various points in his opinion. He noted that Ms. Talley complained of hip pain to Dr. Turner, who recorded in treatment notes that Ms. Talley had a right hip that "pops out at times." (Tr. 56)

The ALJ also acknowledged that Ms. Talley was examined by Owen Kelly, M.D., at Arkansas Orthopaedic Institute in November, 2007. (Tr. 56, 248) Dr. Kelly took x-rays of Ms. Talley that revealed some degenerative disc disease. (Tr. 248) On examination, he noted that she had normal gait, but tenderness of the greater trochanter bursa and around the lumbosacral area. (Tr. 248) He diagnosed low back pain, degenerative disc disease, and right leg radiculopathy. (Tr. 248) He ordered an MRI of

---

[4] In his November, 2009 letter, Dr. Russell noted that Ms. Talley's diabetes mellitus was causing neuropathy in her feet, legs, and hands. (Tr. 535) He did not, however, offer an opinion as to how the neuropathy limited her ability to work.

Ms. Talley's lumbar spine, but she reported to Dr. Turner that she was unable to have the test because of her financial situation. (Tr. 526)

On October 2, 2008, Ms. Talley complained of hip pain during a visit to Stanley Teeter, M.D., at River Valley. (Tr. 471) She was diagnosed with degenerative arthritis in her hip. Dr. Teeter prescribed Etodolac but, as the ALJ noted, that medication was discontinued due to gastritis. (Tr. 57, 470)

At her hearing, Ms. Talley testified that Dr. Teeter had told her she had "bone against bone" on her right hip, and that her hip socket was degenerated. (Tr. 29) She stated that he had advised her to keep as much weight as possible off of it, so she used a cane. (Tr. 29-30) Additionally, Ms. Talley testified that she was not able to bend down to pick up objects that dropped on the floor. (Tr. 25-26) She relied on her brother or mother to come to her house and do that for her. (Tr. 25)

The ALJ discounted the effects of Ms. Talley's hip pain, noting that no surgical treatment was recommended.[5] (Tr. 57) However, Dr. Kelly, the orthopedic specialist, had ordered an MRI in order to have a complete work-up on Ms. Talley, but she was not able to have the test because of her limited financial resources.[6] (Tr. 375) She never

---

[5] Ms. Talley testified at the hearing that she was 5'2" tall and weighed 266 pounds. Ms. Talley's obesity obviously could contribute to making her an unlikely candidate for hip surgery.

[6] It was well known to Ms. Talley's physicians that she had limited financial resources. (Tr. 368, 375, 443, 535)

11

returned to Dr. Kelly, but instead continued to seek treatment for hip pain from her general practitioners at the free clinic. (Tr. 374, 420, 422, 535, 538)

Further, the ALJ noted that none of Ms. Talley's doctors had restricted her activities. However, Ms. Talley's testimony contradicts this assertion. She testified that Dr. Teeter had advised her to keep as much weight off of her hip as possible. The ALJ's opinion does not offer any explanation for discrediting this testimony.

Further, Dr. Russell, one of Ms. Talley's treating physicians, stated that Ms. Talley was unable to sit or stay in one position for an extended period of time. (Tr. 535) While the ALJ did not have Dr. Russell's assessment at the time he wrote his opinion, the Court may consider that opinion, which was available to, and considered by, the Appeals Council. See *United States v. Bergmann*, 207 F.3d 1065, 1068 (8th Cir. 2000) (citing *Riley v. Shalala*, 18 F.3d 619, 622 (8th Cir. 1994)) (the court's role is to determine whether the ALJ's decision is supported by substantial evidence including the evidence submitted after the determination was made).

The ALJ's conclusion that Ms. Talley could perform sedentary work and could occasionally climb, balance, crawl, kneel, stoop, and couch is not supported by substantial evidence in the record.

    4.    Mental Impairments

Ms. Talley also claims that the ALJ erred in assessing her mental impairments. The ALJ concluded Ms. Talley had moderate restriction in activities of daily living; in her

social functioning; and in concentration, persistence, and pace. (Tr. 54) He noted that she was hospitalized in 2001 following a suicide attempt. (Tr. 54) The ALJ found that Ms. Talley's mood disorder was a severe impairment, but he concluded that she maintained the residual functional capacity for unskilled work. (Tr. 52, 55)

Ms. Talley points out that the ALJ declined to discuss the mental consultative examination performed by Don Ott, Psy.D., on September 17, 2008. (Tr. 391-97) Dr. Ott observed that, during the examination, Ms. Talley's affect was rigid and flat. He stated that she made very little eye contact, and that her voice was tired and resigned. (Tr. 393) She seemed distracted and talked excessively during the evaluation. (Tr. 395) Dr. Ott concluded that Ms. Talley's social interaction was "fairly limited." (Tr. 395) Her concentration was impaired, and her capacity to cope with the mental demands of work was deficient. (Tr. 396) Dr. Ott diagnosed Ms. Talley with major depressive disorder, recurrent, moderate and assigned a GAF score of 50-60. (Tr. 395)

The Commissioner points out that the ALJ addressed Dr. Ott's opinion by stating, "the opinions of the claimant's examining and treating physicians are given substantial weight consistent with 20 C.F.R. 404.1527." Further, he argues that Dr. Ott's opinion is not contradictory to the ALJ's assessment of Ms. Talley's residual functional capacity, pointing out that Dr. Ott "never opined as to Plaintiff's actual limitations in concentration or any work-related domain." (#14 at p. 7)

The ALJ's handling of Dr. Ott's opinion was inadequate.  As explained in Social Security Ruling 96-6p, administrative law judges and the Appeals Council are not bound by findings made by State agency or other program physicians and psychologists, but they cannot ignore these opinions and must explain the weight given to the opinions in their decisions.  SSR 96-6p (1996).  Dr. Ott's opinion that Ms. Talley's concentration was impaired and that her ability to cope with the mental demands of work was deficient should have at least been addressed by the ALJ in his opinion.

The ALJ's assessment of Ms. Talley's treatment records was also deficient.  In his opinion, the ALJ based his residual functional capacity assessment on the July, 2008 assessment of Richard H. Sundermann, Jr., M.D.  (Tr. 443-44)  Dr. Sundermann recounted Ms. Talley's history of depression and anxiety.  He noted that she had been unable to afford Effexor and had switched to a generic, but had been unable to afford even an adequate dose of the generic drug.  (Tr. 443)  He diagnosed Ms. Talley with moderate, recurrent major depressive disorder and prescribed Effexor, which he could supply to her through a patient assistance program.  (Tr. 444)

The ALJ states the Effexor resulted in fewer suicidal thoughts and an improved mood.  He summarized the remaining treatment notes by stating that Ms. Talley continued to attend therapy sessions and medication management, "with a few more changes in the medications and improvement of her mood."  Based on this analysis of Ms. Talley's treatment records, the ALJ concluded that she could perform unskilled work.  (Tr. 57)

The ALJ's assessment that Ms. Talley's depression and anxiety were controlled with medication and therapy is not supported by substantial evidence in the record. In April, 2008, Ms. Talley complained of increased anxiety and depression to Dr. Turner. He referred her to Counseling Associates noting that, "[s]he is not actually suicidal but needs more intensive care for depression than I can provide alone." (Tr. 526) In May of 2008, Ms. Talley called Dr. Turner's office seeking samples of Effexor because she could not purchase her medication. (Tr. 527) He was unable to provide samples of Effexor and changed her medication to Cymbalta. (Tr. 527)

On June 4, 2008, Ms. Talley presented to Counseling Associates complaining of anxiety and depression since she was a child. She reported daily symptoms of depression and anxiety, stating that her social anxiety was so severe that she remained isolated and felt like a failure. She was initially diagnosed with major depressive disorder, recurrent, moderate, without psychotic features, and anxiety disorder with agoraphobia. She was assigned a GAF score of 50. (Tr. 331-336)

On July 9, 2008, Dr. Sundermann evaluated Ms. Talley. He noted that she had a difficult time digesting her food and medicine because she had undergone gastric bypass surgery in 2001. He stated that Prozac, which Ms. Talley had previously taken with good result, had stopped working. She reported a failed suicide attempt years earlier, which had resulted in her being psychiatrically hospitalized for seven days. (Tr. 443-44) Dr. Sundermann prescribed Effexor XR and therapy. (Tr. 444)

On August 26, 2008, Ms. Talley began therapy with Erin Willcutt, LAC. (Tr. 447) On September 8, 2008, Ms. Talley was evaluated by Sam Hernandez, APN. Progress notes from the visit indicate that Ms. Talley reported that her depression seemed worse and that she wanted to stay in bed most of the time. (Tr. 441) She was observed to have a flat affect and admitted to having fleeting suicidal thoughts with a plan at times. Nurse Hernandez increased her Effexor, and Ms. Talley agreed to allow her brother to help her manage her medications. (Tr. 441)

During a therapy session on September 12, 2008, Ms. Talley seemed to be doing better. (Tr. 446) But on October 1, 2008, her therapist noted that her response to treatment has been "marginal," and her anxiety level was very high. (Tr. 445) On October 6, 2008, Ms. Talley returned to Nurse Hernandez, who noted that she seemed to be doing quite a bit better. (Tr. 440)

Ms. Talley returned to see Ms. Willcutt on October 14, 2008. Ms. Willcutt noted that Ms. Talley seemed to be doing a little better, but still has difficulty getting motivated to do things to improve her situation. (Tr. 503) During visits on November 12, 2008, and December 9, 2008, Ms. Talley reported doing better. (Tr. 501-502) On December 11, 2008, Nurse Hernandez diagnosed major depressive disorder, recurrent, moderate and continued her on Effexor and individual therapy. (Tr. 489)

On January 15, 2009, Ms. Talley reported feeling a little more depressed, but she returned on February 4, 3009, to report feeling better. (Tr. 499-500)

Ms. Willcutt noted that at her session on March 6, 2009, Ms. Talley had a depressed mood.  She noted that Ms. Talley was not doing as well as she had been at her last visit and reported feeling very depressed after her mother had yelled at her.  (Tr. 498)

Ms. Talley was examined by Roy Ragsdill, M.D., on April 7, 2009.  Ms. Talley complained to Dr. Ragsdill of problems with her mother and social anxiety.  He suggested adding dependent personality traits to her diagnosis and noted that Ms. Talley had only a "partial response to Effexor" but that he was "reluctant" to change her medications.  (Tr. 488)  He continued her medications and suggested an increase in therapy to weekly.  (Tr. 488)

Ms. Willcutt reported that on April 21, 2009, Ms. Talley's response to therapy was "minimal" and her thought patterns were "very negative."  (Tr. 497)  Ms. Willcutt suggested that they increase their sessions.  (Tr. 497)

On May 5, 2009, Ms. Talley was noted to have a very depressed mood, negative thought process, and very tearful behavior.  Ms. Talley admitted to thoughts of wanting to die and not wanting to go on, but denied any plan or intent to harm herself.  Ms. Willcutt discussed possible acute care with Ms. Talley, but she rejected the idea because she had formerly worked at the acute unit and felt this would make her feel like more of a failure. (Tr. 496)

Ms. Willcutt noted that cognitive therapy was minimally successful and noted her intention to meet with her case manager and discuss the case with Ms. Talley's

psychiatrist. (Tr. 496) Ms. Willcutt recommended an increased level of care for Ms. Talley with weekly therapy and meetings twice per month with her case manager. (Tr. 496)

Notes from Ms. Talley's May 20, 2009 therapy session indicate that she exhibited depressed mood, negative thought process, and no change in behavior of functioning. (Tr. 495) On June 16, 2009, Dr. Ragsdill examined Ms. Talley. He noted that her mood was somewhat better, but discussed with her the possibility of adding lithium as an augmentation to her treatment. Ms. Talley rejected the idea. (Tr. 534)

Notes from Ms. Talley's therapy session with Ms. Willcutt on November 18, 2009, indicate that Ms. Talley's response to therapy was not positive. (Tr. 548) She stated, "Brenda is very depressed and apathetic about her current living situation. She was very negative in session and reports having no energy to do or work on current situation. She reports feeling like 'Brenda' is slipping away." (Tr. 548) Ms. Willcutt noted that "Brenda is isolating and avoiding friends, family, and appointments when possible." She recommended that Ms. Talley increase the frequency of her therapy sessions and case management appointments. (Tr. 548)

Ms. Willcutt met with Ms. Talley again on December 9, 2009. (Tr. 549) She noted that Ms. Talley's mood was depressed and overwhelmed; her thoughts were negative; and her behavior was anxious. Ms. Talley reported difficulties living with her mentally ill

mother and brother. Ms. Willcutt noted that Ms. Talley's activity level was "significantly reduced." (Tr. 549)

On December 9, 2009, Ms. Talley was also seen by her psychiatrist, Dr. Ragsdill. (Tr. 547) He noted that Ms. Talley was walking with a cane, was anxious, and did not want to go out much. He assessed that she was having an "incomplete response" to her antidepressant regimen. He increased her Effexor to the maximum dose and added lithium. (Tr. 547)

In a treatment and prognosis summary dated December 13, 2009, Ms. Willcutt noted that Ms. Talley's depression and anxiety had increased over the past several months.[7] (Tr. 550) She pointed out that Ms. Talley's thought patterns were increasingly negative and her anxiety was more apparent. She stated that she had agreed with her current diagnosis of major depressive disorder, recurrent, moderate to severe and anxiety disorder NOS and stated that, in her opinion, Ms. Talley's prognosis was guarded, due to the recurrent nature of her mental disorder and severe stressors. (Tr. 550)

Evidence from treating sources are generally accorded great weight because they are most able to provide a longitudinal picture of a claimant's impairments. 20 C.F.R. § 416.927. The ALJ had access to Ms. Talley's treatment records from Counseling Associates through June, 2009, but opted to focus on the first few months of her

---

[7] Like Dr. Russell's letter, Ms. Willcutt's summary was submitted to the Appeals Council after the ALJ issued his opinion. It was considered by the Appeals Council, however, when it declined to review the ALJ's decision. (Tr. 1-4)

treatment, when she showed some signs of improvement. The Appeals Council had access to Ms. Talley's records through December, 2009, but concluded that the information did not provide a basis for changing the ALJ's decision. The Court disagrees.

The treating source records, taken as a whole, indicate that Ms. Talley's depression and anxiety had not improved on medication but, in fact, steadily declined after March of 2009. The ALJ erred by failing to address Dr. Ott's opinion and by relying on a six-month snapshot of Ms. Talley's treatment records when assessing her mental residual functional capacity.

## IV.  Conclusion:

After consideration of the record as a whole, the Court concludes that the decision of the Commissioner is not supported by substantial evidence. The Commissioner's decision is reversed and remanded for action consistent with this opinion. This is a "sentence four" remand within the meaning of 42 U.S.C. § 405(g) and *Melkonyan v. Sullivan*, 501 U.S. 89 (1991).

IT IS SO ORDERED this 11th day of April, 2011.

_____
UNITED STATES MAGISTRATE JUDGE